IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN

|  |  |  |
|---|---|---|
| FLYING DOG BREWERY, LLLP | ) | Case No. 1:11-CV-00307-RJJ |
|  | ) |  |
| Plaintiff, | ) | MEMORANDUM OF POINTS AND |
|  | ) | AUTHORITIES IN SUPPORT OF |
| v. | ) | PLAINTIFF'S MOTION FOR |
|  | ) | PRELIMINARY INJUNCTION |
| MICHIGAN LIQUOR CONTROL | ) |  |
| COMMISSION, et al., | ) | ORAL ARGUMENT REQUESTED |
|  | ) |  |
| Defendants. | ) |  |
|  | ) |  |
| _____ | ) |  |

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

COMES NOW the Plaintiff, Flying Dog Brewery, LLLP, by and through undersigned

counsel, and submits its Memorandum of Points and Authorities in Support of its Motion for

Preliminary Injunction.

Dated: April 13, 2011          Respectfully Submitted,

Alan Gura
GURA & POSSESSKY, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax: 703.997.7665
alan@gurapossessky.com


By:    /s/ Alan Gura_____
       Alan Gura

Attorneys for Plaintiff Flying Dog Brewery, LLLP

TABLE OF CONTENTS

Table of Authorities.......................................................... iii

Preliminary Statement........................................................ 1

Statement of Facts........................................................... 1

    *Flying Dog and Ralph Steadman*........................................... 1

    *The Regulatory Framework*................................................ 4

    *Defendants' Censorship of Plaintiff's Expression*........................ 4

Summary of Argument......................................................... 6

Argument.................................................................... 7

    I.      DEFENDANTS' LABELING RULE IS AN UNCONSTITUTIONAL PRIOR RESTRAINT AGAINST PROTECTED SPEECH. ................. 8

          A.    Content-Based Prior Restraints Cannot Grant Officials Unbridled Discretion. ............................................ 9

          B.    Content-Based Prior Restraints Must Afford Adequate Due Process. .... 10

          C.    The Beer Label Rule Lacks Proper Standards and Provides No Due Process. ......................................................... 10

    II.     DEFENDANTS' LABELING RULE IS VOID FOR VAGUENESS.......... 11

    III.   DEFENDANTS VIOLATED FLYING DOG'S FIRST AMENDMENT RIGHTS........................................................... 12

          A.    The First Amendment Protects Flying Dog's "Raging Bitch" Label..... 12

          B.    Content-Based Restrictions On Protected Speech Are Strongly Disfavored........................................................ 15

          C.    Flying Dog's Label Cannot Be Censored for Allegedly Giving Offense........................................................... 17

i

D.      Even Were Defendants' Child-Protection Interest At Issue,
        Censorship of Flying Dog's Label Does Not Substantially
        Advance Child Protection Interests. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

E.      Even if Censoring Flying Dog's Label Substantially Advanced
        A Governmental Interest, the Ban Is More Extensive than
        Necessary, and Not Narrowly Tailored. . . . . . . . . . . . . . . . . . . . . . . . . . 21

IV.     INJUNCTIVE RELIEF IS NECESSARY TO AVERT
        IRREPARABLE HARM. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

V.      THE BALANCE OF HARM FAVORS FLYING DOG, AS AN
        INJUNCTION WOULD NOT HARM DEFENDANTS. . . . . . . . . . . . . . . . . 23

VI.     THE PUBLIC INTEREST FAVORS IMMEDIATE
        INJUNCTIVE RELIEF. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

VII.    THE INJUNCTION SHOULD ISSUE WITHOUT
        REQUIRING SECURITY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Conclusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

TABLE OF AUTHORITIES

Cases

*44 Liquormart, Inc.* v. *Rhode Island*,
 517 U.S. 484 (1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 16

*Ashcroft* v. *ACLU*,
 535 U.S. 564 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Bad Frog Brewery, Inc.* v. *New York State Liquor Authority*,
 134 F.3d 87 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 22

*Bolger* v. *Youngs Prods. Corp.*,
 463 U.S. 60 (1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14, 16-18, 22

*Bronco's Entm't* v. *Charter Twp. of Van Buren*,
 421 F.3d 440 (6th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Butler* v. *Michigan*,
 352 U.S. 380 (1957). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Cantwell* v. *Connecticut*,
 310 U.S. 296 (1940). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Carey* v. *Population Servs. Int'l*,
 431 U.S. 678 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 17

*Central Hudson Gas & Electric Corp* v. *Pub. Svc. Comm'n of New York*,
 447 U.S. 557 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*Charette* v. *Town of Oyster Bay*,
 159 F.3d 749 (2d Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Chesapeake B & M, Inc.* v. *Harford County*,
 58 F.3d 1005 (4th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Citizens United* v. *FEC*,
 130 S. Ct. 876 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*City of Lakewood* v. *Plain Dealer Publ'g Co.*,
 486 U.S. 750 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11

iii

*City of Los Angeles* v. *Alameda Books*,
    535 U.S. 425 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Cohen* v. *California*,
    403 U.S. 15 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 18

*Deja Vu of Nashville, Inc.* v. *Metro. Gov't of Nashville & Davidson County*,
    274 F.3d 377 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10

*Dunagin* v. *Oxford*,
    718 F.2d 738 (5th Cir. 1983) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*East Brooks Books, Inc.* v. *City of Memphis*,
    48 F.3d 220 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*East Brooks Books, Inc.* v. *Shelby County*,
    588 F.3d 360 (6th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10

*Edenfield* v. *Fane*,
    507 U.S. 761 (1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*ETW Corp.* v. *Jireh Publ'g, Inc.*,
    332 F.3d 915 (6th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*FCC v. Pacifica Found.*,
    438 U.S. 726 (1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 13, 19

*Forsyth County* v. *Nationalist Movement*,
    505 U.S. 123 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Freedman* v. *Maryland*,
    380 U.S. 51 (1965). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*FW/PBS* v. *City of Dallas*,
    493 U.S. 215 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*G & V Lounge, Inc.* v. *Michigan Liquor Control Commission*,
    23 F.3d 1071 (6th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Gentile* v. *State Bar of Nevada*,
    501 U.S. 1030 (1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Grayned* v. *City of Rockford*,
    408 U.S.104 (1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Greater New Orleans Broad. Ass'n* v. *United States*,
    527 U.S. 173 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Greene* v. *Sinclair*,
    491 F. Supp. 19 (W.D. Mich. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*H.D.V.-Greektown, LLC* v. *City of Detroit*,
    568 F.3d 609 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9

*Hamilton's Bogarts, Inc.* v. *State of Michigan*,
    501 F.3d 644 (6th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 15, 17

*Hornell Brewing Co.* v. *Brady*,
    819 F. Supp. 1227 (E.D.N.Y. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

*Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*,
    515 U.S. 557 (1995).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Hustler Magazine* v. *Falwell*,
    485 U.S. 46 (1988).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 17

*Hynes* v. *Mayor & Council of Oradell*,
    425 U.S. 610 (1976).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Int'l Dairy Foods Ass'n* v. *Boggs*,
    622 F.3d 628 (6th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*Jones* v. *Caruso*,
    569 F.3d 258 (6th Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 23, 24

*King Enterprises, Inc.* v. *Thomas Township*,
    215 F. Supp. 2d 891 (E.D. Mich. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Largent* v. *Texas*,
    318 U.S. 418 (1943) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Lorillard Tobacco Co.* v. *Reilly*,
    533 U.S. 525 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Michigan Beer & Wine Wholesalers' Ass'n* v. *Attorney General*,
    142 Mich. App. 294 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 14

*Miller* v. *California*,
    413 U.S. 15 (1973). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Moltan Co.* v. *Eagle-Picher Indus.*,
    55 F.3d 1171 (6th Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Nat'l Endowment for the Arts* v. *Finley*,
    524 U.S. 569 (1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Niemotko* v. *Maryland*,
    340 U.S. 268 (1951). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Overstreet* v. *Lexington-Fayette Urban County Gov't*,
    305 F.3d 566 (6th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Pagan* v. *Fruchey*,
    492 F.3d 766 (6th Cir. 2007) (en banc). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 20

*Reno* v. *ACLU*,
    521 U.S. 844 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Riley* v. *Nat'l Fed'n of Blind*,
    487 U.S. 781 (1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Rubin* v. *Coors Brewing Co.*,
    514 U.S. 476 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Sable Communications of Cal., Inc.* v. *FCC*,
    492 U.S. 115 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Sambo's Restaurants, Inc.* v. *Ann Arbor*,
    663 F.2d 686 (6th Cir. 1981). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Shuttlesworth* v. *Birmingham*,
    394 U.S. 147 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-10

*Snyder* v. *Phelps*,
    131 S. Ct. 1207 (2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

vi

*Spence* v. *Washington*,
    418 U.S. 405 (1974) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*Staub* v. *City of Baxley*,
    355 U.S. 313 (1958) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Texas* v. *Johnson*,
    491 U.S. 397 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*United States* v. *Playboy Entm't Group*,
    529 U.S. 803 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 18

*United States* v. *Stevens*,
    130 S. Ct. 1577 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Winters* v. *New York*,
    333 U.S. 507 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Statutes and Rules

MICH. ADMIN. CODE R. 436.1303. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

MICH. ADMIN. CODE R. 436.1309. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

MICH. ADMIN. CODE R. 436.1609. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

MICH. ADMIN. CODE R. 436.1611(1)(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

MICH. ADMIN. CODE R. 436.1611(1)(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

MICH. ADMIN. CODE R. 436.1611(1)(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 10

MICH. COMP. LAWS § 436.1203(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

MICH. COMP. LAWS § 436.1901(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

MICH. COMP. LAWS § 436.1909(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

MICH. COMP. LAWS § 436.1909(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

MICH. COMP. LAWS § 750.141. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Mɪᴄʜ. Cᴏᴍᴘ. Lᴀᴡs § 750.159. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Other Authorities

*Mich. Atty. Gen. Op.* No. 7146,
    2004 Mich. AG LEXIS 4 (Jan. 8, 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

PRELIMINARY STATEMENT

Beer bottles should be regulated not by the expression of their labels, but by the character of their content. Regrettably, the Michigan Liquor Control Commission ("MLCC") and its members have taken it upon themselves to control not merely alcoholic beverages, but speech as well. Acting as a censorial board, Defendants wield state authority to impose their personal tastes as a prior restraint against core First Amendment expression that happens to be placed on beer labels. Defendants have disrupted Plaintiff's communication with Michigan residents by banning the sale of RAGING BITCH Twentieth Anniversary Belgian-Style India Pale Ale, theorizing that the beer's gonzo-inspired label is "detrimental to the public health, safety and welfare."

Defendants' clear First Amendment violation must be enjoined without delay.

STATEMENT OF FACTS

*Flying Dog and Ralph Steadman*

Plaintiff Flying Dog Brewery, LLLP ("Flying Dog"), creates and sells craft beers, shipping approximately 900,000 cases a year worldwide for sale in the retail, bar, and restaurant businesses. Flying Dog takes its name from a painting of a flying dog hanging in a Pakistani hotel, which brewery co-founder George Stranahan happened upon after a Himalayan climbing expedition. Appreciating the artwork's can-do spirit, Stranahan adopted the moniker for his brewery because it represents the idea that "it is amazing what you can achieve if nobody tells you that you can't." Caruso Decl., ¶ 2.

1

Stranahan, and in-turn, Flying Dog, were influenced by Stranahan's longtime friend and neighbor, the iconoclastic journalist and literary figure Hunter S. Thompson. Flying Dog's identity, and that of its products, is inextricably imbued with and promotes the irreverent "gonzo" spirit and outlook for which Thompson is noted. Caruso Decl., ¶ 3.

Thompson often collaborated with the artist Ralph Steadman, most notably on their book FEAR AND LOATHING IN LAS VEGAS, to which Steadman contributed illustration. Steadman is renowned for expressing social and political commentary through his art. Steadman has won numerous awards, including the Francis Williams Book Illustration Award for ALICE IN WONDERLAND, the American Society of Illustrators' Certificate of Merit, the W H Smith Illustration Award for I LEONARDO, the Dutch Silver Paintbrush Award for INSPECTOR MOUSE, the Italian Critica in Erba Prize for THAT'S MY DAD, the BBC Design Award for postage stamps, the Black Humour Award in France, and several Designers and Art Directors Association Awards. He was voted Illustrator of the Year by the American Institute of Graphic Arts in 1979. As well as writing and illustrating his own books and Thompson's, Steadman has worked with writers including Ted Hughes, Adrian Mitchell and Brian Patten, and also illustrated editions of TREASURE ISLAND, ANIMAL FARM and most recently, FAHRENHEIT 451. Steadman illustrates Will Self's column in the British INDEPENDENT newspaper, and also writes for KOTORI MAGAZINE. Steadman's work has also appeared in PUNCH, PRIVATE EYE, the DAILY TELEGRAPH, the NEW YORK TIMES, and ROLLING STONE. Caruso Decl., ¶ 4.

Thompson introduced Flying Dog to Steadman, and the two began a partnership under which Steadman produces, under license, illustration for Flying Dog's corporate imaging. Steadman's illustrations grace the labels of Flying Dog's beers and beer packaging, and are also

sold and otherwise distributed by Flying Dog on other merchandise, including posters and clothing. Caruso Decl., ¶ 5.

Appreciation of art, both the art of beer-craft and the visual arts, lies at the core of Flying Dog's philosophy. As Stranahan noted, "Art is our first language and we like and agree with what Ralph Steadman chooses to say through his art on our labels; that this is a wonderful world on a wacky path." The dogs depicted on Flying Dog's labels "are a reflection of the people we strive to be, carefree and spontaneous, rough around the edges but with real charm." Caruso Decl., ¶ 6. Flying Dog's ales include DOGGIE STYLE Classic Pale Ale, IN HEAT WHEAT Hefeweizen Ale, OLD SCRATCH Amber Lager, ROAD DOG Porter, TIRE BITE Golden Ale, SNAKE DOG India Pale Ale, GONZO Imperial Porter, HORN DOG Barley Wine, DOUBLE DOG Double Pale Ale, KERBEROS Tripel, and seasonal ales GARDE DOG Biere de Garde, WOODY CREEK WHITE Belgian Wit, DOGTOBERFEST Marzen, and K-9 CRUISER Winter Ale. Caruso Decl., ¶ 7.

In celebration of its twentieth anniversary, Flying Dog created RAGING BITCH, a Belgian-style India Pale Ale. Voted among the "Top Ten New Beers in America in 2010" by MODERN BREWERY AGE, RAGING BITCH is now Flying Dog's top selling beer. Caruso Decl., ¶ 8. The beer's label contains a Steadman drawing of a female dog, along with the following inscription:

> "Two inflammatory words ... one wild drink. Nectar imprisoned in a bottle. Let it out. It is cruel to keep a wild animal locked up. Uncap it. Release it .... stand back!! Wallow in its golden glow in a glass beneath a white foaming head. Remember, enjoying a RAGING BITCH, unleashed, untamed, unbridled—and in heat—is pure GONZO!! It has taken 20 years to get from there to here. Enjoy!" – Ralph Steadman

Caruso Decl., ¶ 9; Exhibit A. Flying Dog tested the RAGING BITCH brand prior to its launch, receiving a very favorable response that resonated well with its product and established identity, and generating no negative feedback as being offensive. Caruso Decl., ¶ 11.

3

*The Regulatory Framework*

As an out-of-state beer manufacturer that makes and packages its own product, Flying Dog must apply to the MLCC for a license to sell its product within Michigan. MICH. COMP. LAWS § 436.1203(1); MICH. ADMIN. CODE R. 436.1609. Failure to obtain authorization from the MLCC for the importation, distribution, or sale of alcohol carries significant criminal penalties, including fine, imprisonment, and forfeiture. MICH. COMP. LAWS §§ 436.1901(4), 436.1909(3), 436.1909(4) and 750.159f-x.

Defendant MLCC directly regulates the advertisement of alcohol in Michigan, including beer bottle labels. MICH. ADMIN. CODE R. 436.1303. MLCC reserves the authority to review and reject any advertising that does not meet its standards. MICH. ADMIN. CODE R. 436.1309. Beer must be truthfully labeled with the contents of the beverage and must be registered with and approved for sale by MLCC. MICH. ADMIN. CODE R. 436.1611(1)(b)-(c). Defendants reserve to themselves the right to reject the registration of any beer label "that is deemed to promote violence, racism, sexism, intemperance, or intoxication or to be detrimental to the health, safety, or welfare of the general public." MICH. ADMIN. CODE R. 436.1611(1)(d).

*Defendants' Censorship of Plaintiff's Expression*

On or about September 17, 2009, Flying Dog applied to the MLCC for a license to sell RAGING BITCH. Caruso Decl., ¶ 12. On or about November 18, 2009, Defendants Samona, Weatherspoon, and Gagliardi, acting as Defendant MLCC, denied the application under MICH. ADMIN. CODE R. 436.1611(1)(d), based upon the following finding:

> The Commission finds that the proposed label which includes the brand name "Raging Bitch" contains such language deemed detrimental to the health, safety, or welfare of the general public.

Exh. B. Flying Dog sought an administrative appellate hearing (in effect, a request for reconsideration) from that order.

At the hearing, MLCC's attorney objected not only to the RAGING BITCH brand name, but also to Steadman's label statement. And although MLCC's attorney offered he was not suggesting the censorship of Flying Dog's website, he pointed to Flying Dog's website in asserting that "there is a tenor, if you will, to the promotion that I think that you [the MLCC] have quite correctly caught and need to address." Caruso Decl., ¶ 15; Exh. C, p. 10, l. 15- p.11, l. 5. Defendant Weatherspoon repeatedly expressed his objection to the label's copy, "Remember, enjoying a RAGING BITCH, unleashed, untamed, unbridled—and in heat—is pure GONZO!!" Caruso Decl., ¶ 16; Exh. C, p. 11, l.9-20; p. 13, l.8-p.14, l. 7. Defendant Gagliardi offered,

> We understand Gonzo Journalism, and I'm certainly not aversed [sic], and I don't think Commissioner Weatherspoon or the Chairwoman [Defendant Samona] are aversed [sic] to having or reading edgy writing; but we do have a responsibility here to place product in a public place with the names that are on it, and that's what we take very seriously.

Exh. C, p. 11, l. 11-17. On or about July 7, 2010, Defendants Weatherspoon and Gagliardi, acting as the MLCC, affirmed their earlier decision barring the sale of RAGING BITCH, stating:

> The Commission . . . continues to find that the label in question contains such language deemed detrimental to the health, safety or welfare of the general public and the basis of denial as set forth in its order of November 18, 2009, should be upheld.

> Therefore, it is the order of the Commission that its order of November 18, 2009 relative to the applicant's request to register "Raging Bitch" Belgian-style India Pale Ale for sale in the State of Michigan BE AFFIRMED.

Exh. D.

Flying Dog would advertise and sell RAGING BITCH in Michigan, but refrains from doing so because it reasonably fears criminal penalties absent MLCC's license. Flying Dog would also

advertise and sell other beers it may yet create, which would need to satisfy Defendants' beer labeling regulation. Caruso Decl., ¶ 18. In addition to the suppression of its speech, Flying Dog's inability to legally sell RAGING BITCH in Michigan has damaged Flying Dog by costing it significant sales of RAGING BITCH beer and ancillary RAGING BITCH-branded products, as well as generally damaging Flying Dog's goodwill in Michigan and thus hurting the sales of Flying Dog's other beers and products that may be legally sold in Michigan. Caruso Decl., ¶ 19.

## SUMMARY OF ARGUMENT

Defendant Gagliardi is wrong in conceiving of MLCC's "responsibility" as "placing product in a public space with the names that are on it." Responsibility for the content of speech rests with speakers, not regulators. Defendants may regulate alcohol—not speech.

The First Amendment is fully binding upon the state's police power to regulate alcohol. Accordingly, the Amendment's protection extends to beer labels. State officials' imposition of a prior restraint against the content of beer label speech, like any prior restraint against the exercise of fundamental rights, comes before the Court bearing a heavy presumption against its constitutionality. Any such regulation cannot vest in Defendants unbridled discretion to determine the content of speech, but must be based employ narrowly-defined, objective guidelines, and afford speakers appropriate due process protections. Defendants' regulation plainly fails to satisfy First Amendment prior restraint standards and for this reason alone is void on its face. For largely the same reasons, the regulation—which leaves to Defendants' complete discretion the power to determine what speech is allegedly harmful to the public—is unconstitutionally vague.

Defendants' censorship of Flying Dog's label also fails to serve any valid state interest, let alone a compelling one. The state may generally not shield the public from allegedly offensive speech—even if the speech is purely commercial in nature. Nothing in the RAGING BITCH label constitutes obscenity or even indecency. Defendants' failure to appreciate Flying Dog's expression is regrettable, but it is nothing that they might hold against the brewer.

Considering its certain success on the ultimate merits, Flying Dog is entitled to preliminary injunctive relief. Flying Dog is also suffering irreparable harm, for which there is no adequate remedy at law, and granting it relief cannot injure Defendants. Given the degree to which the labeling regulation threatens protected speech, the public interest—already favoring the exercise of fundamental rights—requires enjoining Defendants' unconstitutional practices.

ARGUMENT

Four factors determine a party's entitlement to preliminary injunctive relief: "(1) the likelihood that the movant will succeed on the merits; (2) whether the movant will suffer irreparable harm without the injunction; (3) the probability that granting the injunction will cause substantial harm to others; and (4) whether the public interest will be advanced by issuing the injunction." *Jones* v. *Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (citation omitted). "These factors are not strict prerequisites, but [should] be balanced against each other." *Overstreet* v. *Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

Nonetheless, "[w]hen a party seeks a preliminary injunction on the basis of a potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor." *Jones*, 569 F.3d at 265-66 (citation omitted). "[B]ecause the questions of harm to the parties and the public interest cannot be addressed properly in the First Amendment

7

context without first determining if there is a constitutional violation, the crucial inquiry often is . . . whether the [regulation] at issue is likely to be found constitutional." *Jones*, 569 F.3d at 266 (citations omitted).

Plaintiff will succeed on the merits of its First Amendment claim, and the balance of the remaining factors weigh heavily in its favor. Accordingly, a preliminary injunction is warranted.

I.     DEFENDANTS' LABELING RULE IS AN UNCONSTITUTIONAL PRIOR RESTRAINT AGAINST PROTECTED SPEECH.

"A 'prior restraint' exists when the exercise of a First Amendment right depends on the prior approval of public officials." *Bronco's Entm't* v. *Charter Twp. of Van Buren*, 421 F.3d 440, 444 (6th Cir. 2005).

> It is settled by a long line of recent decisions of this Court that an ordinance which . . . makes the peaceful enjoyment of freedoms which the Constitution guarantees contingent upon the uncontrolled will of an official -- as by requiring a permit or license which may be granted or withheld in the discretion of such official -- is an unconstitutional censorship or prior restraint upon the enjoyment of those freedoms.

*Staub* v. *City of Baxley*, 355 U.S. 313, 322 (1958) (citations omitted); *FW/PBS* v. *City of Dallas*, 493 U.S. 215, 226 (1990) (plurality); *Shuttlesworth* v. *Birmingham*, 394 U.S. 147, 151 (1969).

"Any system of prior restraints comes to this Court bearing a heavy presumption against its constitutional validity." *Deja Vu of Nashville, Inc.* v. *Metro. Gov't of Nashville & Davidson County*, 274 F.3d 377, 400 (6th Cir. 2001) (citation omitted). "[A] facial challenge lies whenever a licensing law gives a government official or agency substantial power to discriminate based on the content or viewpoint of speech by suppressing disfavored speech or disliked speakers." *H.D.V.-Greektown, LLC* v. *City of Detroit*, 568 F.3d 609, 620 (6th Cir. 2009) (quoting *City of Lakewood* v. *Plain Dealer Publ'g Co.*, 486 U.S. 750, 759 (1998)).

> Constitutional invalidity of prior restraints may result from one or both of two evils: (1) the risk of censorship associated with the vesting of unbridled discretion in government officials; and (2) the risk of indefinitely suppressing permissible speech when a licensing law fails to provide for the prompt issuance of a license.

*East Brooks Books, Inc.* v. *Shelby County*, 588 F.3d 360, 369 (6th Cir. 2009). Each concern provides an independent basis upon which to scrutinize content-based prior restraints.

A.      Content-Based Prior Restraints Cannot Grant Officials Unbridled Discretion.

"[A]n ordinance can vest 'substantial power' in local officials to engage in content-based discrimination . . . by placing 'unbridled discretion in the hands of a government official or agency.'" *H.D.V.-Greektown*, 568 F.3d at 620 (quoting *FW/PBS*, 493 U.S. at 225)). "To avoid granting such unbridled discretion, ordinances must contain precise and objective criteria on which they must make their decisions; an ordinance that gives too much discretion to public officials is invalid." *Id.* (citations omitted). "Unbridled discretion naturally exists when a licensing scheme does not impose adequate standards to guide the licensor's discretion." *Chesapeake B & M, Inc.* v. *Harford County*, 58 F.3d 1005, 1009 (4th Cir. 1995) (en banc).

The right of free speech "has a firmer foundation than the whims or personal opinions of a local governing body." *Niemotko* v. *Maryland*, 340 U.S. 268, 272 (1951). Accordingly, standards governing prior restraints must be "narrow, objective and definite." *Shuttlesworth*, 394 U.S. at 151. Standards involving "appraisal of facts, the exercise of judgment, [or] the formation of an opinion" are unacceptable. *Forsyth County* v. *Nationalist Movement*, 505 U.S. 123, 131 (1992) (quoting *Cantwell* v. *Connecticut*, 310 U.S. 296, 305 (1940)). "In other words, the decision to grant or deny the license application must be virtually a ministerial one." *Greene* v. *Sinclair*, 491 F. Supp. 19, 23 (W.D. Mich. 1980) (citations omitted).

9

> Even when the use of its public streets and sidewalks is involved, therefore, a municipality may not empower its licensing officials to roam essentially at will, dispensing or withholding permission to speak, assemble, picket, or parade, according to their own opinions regarding the potential effect of the activity in question on the "welfare," "decency," or "morals" of the community.

*Shuttlesworth*, 394 U.S. at 153; *see also City of Lakewood*, 486 U.S. at 769 (striking down as "illusory 'constraint'" allowance for "such other terms and conditions deemed necessary and reasonable by the Mayor"); *Largent* v. *Texas*, 318 U.S. 418, 422 (1943) (permit when mayor "deems it proper or advisable"); *East Brooks Books, Inc.* v. *City of Memphis*, 48 F.3d 220, 227 (6th Cir. 1995) ("demonstrated inability" to operate business); *Charette* v. *Town of Oyster Bay*, 159 F.3d 749, 754 (2d Cir. 1998) ("welfare and benefit of the people of and visitors to the city").

    B.    Content-Based Prior Restraints Must Afford Adequate Due Process.

Any content-based prior restraint must include three procedural safeguards.

> First, the decision whether or not to grant a license must be made within a specified, brief period, and the status quo must be preserved pending a final judicial determination on the merits. Second, the licensing scheme "must also assure a prompt judicial decision, to minimize the deterrent effect of an interim and possibly erroneous denial of a license." Third, the licensing scheme must place the burden of instituting judicial proceedings and proving that expression is unprotected on the licensor rather than the exhibitor.

*Deja Vu*, 274 F.3d at 400 (citing *Freedman* v. *Maryland*, 380 U.S. 51, 58-59 (1965)).[1]

    C.    The Beer Label Rule Lacks Proper Standards and Provides No Due Process.

Defendants' reservation of authority to reject any beer label "that is deemed to promote violence, racism, sexism, intemperance, or intoxication or to be detrimental to the health, safety, or welfare of the general public," MICH. ADMIN. CODE R. 436.1611(1)(d), plainly targets speech on the basis of its content, and just as plainly, falls woefully short of all constitutional standards

---

[1] The third requirement is inapplicable in prior restraints based on content-neutral criteria, e.g. zoning rules for adult establishments. *See, e.g. East Brooks Books*, 588 F.3d at 369.

governing prior restraints. "To allow these illusory 'constraints' to constitute the standards necessary to bound a licensor's discretion renders the guarantee against censorship little more than a high-sounding ideal." *City of Lakewood*, 486 U.S. at 769-70. Whatever Defendants deem "detrimental" to society is banned. No standards, let alone narrowly defined, objective standards, guide the inquiry, and Defendants' application of this rule generates no judicial procedures, let alone prompt, neutral evaluations. This classic form of unlawful prior restraint must be enjoined.

## II.    DEFENDANTS' LABELING RULE IS VOID FOR VAGUENESS.

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned* v. *City of Rockford*, 408 U.S.104, 108 (1972). Vagueness doctrine applies with particular force in review of laws dealing with speech. "[S]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech; a man may the less be required to act at his peril here, because the free dissemination of ideas may be the loser." *Hynes* v. *Mayor & Council of Oradell*, 425 U.S. 610, 620 (1976). "Under the First Amendment, 'speakers are protected from arbitrary and discriminatory enforcement of vague standards.'" *King Enterprises, Inc.* v. *Thomas Township*, 215 F. Supp. 2d 891, 917 (E.D. Mich. 2002) (quoting *Nat'l Endowment for the Arts* v. *Finley*, 524 U.S. 569, 588 (1998)). "The prohibition against vague regulations of speech is based in part on the need to eliminate the impermissible risk of discriminatory enforcement." *Id.* (quoting *Gentile* v. *State Bar of Nevada*, 501 U.S. 1030, 1051 (1991)).

Just as its complete lack of objective standards renders Defendants' beer label rule an impermissible prior restraint, the same defect renders the enactment void for vagueness. In

11

designing its labels, Flying Dog has no way of knowing what speech might offend Defendants'
sensibilities. The First and Fourteenth Amendments demand more specific guidance.

III.     DEFENDANTS VIOLATED FLYING DOG'S FIRST AMENDMENT RIGHTS.

     A.     The First Amendment Protects Flying Dog's "Raging Bitch" Label.

     Visual art and the written word are among the basic forms of speech protected by the First
Amendment. *See, e.g.*, *Winters* v. *New York*, 333 U.S. 507 (1948) (magazine with comics,
photos, and true crime stories); *Hustler Magazine* v. *Falwell*, 485 U.S. 46 (1988) (illustrated
liquor advertisement parody). "[I]n the area of freedom of speech and press the courts must
always remain sensitive to any infringement on genuinely serious literary, artistic, political, or
scientific expression." *Ashcroft* v. *ACLU*, 535 U.S. 564, 574 (2002) (internal quotation omitted).

     First Amendment protection also extends to mere words:

> We cannot indulge the facile assumption that one can forbid particular words without also
> running a substantial risk of suppressing ideas in the process. Indeed, governments might
> soon seize upon the censorship of particular words as a convenient guise for banning the
> expression of unpopular views.

*Cohen* v. *California*, 403 U.S. 15, 26 (1971). The obscenity at issue in *Cohen* usually lacks
constitutional protection, but the case demonstrates that "[s]ome uses of even the most offensive
words are unquestionably protected." *FCC v. Pacifica Found.*, 438 U.S. 726, 746 (1978).

     The RAGING BITCH label—including words and illustration by a renowned artist, and
expressing Flying Dog's irreverent spirit—plainly constitutes protected speech. Of course, no
part of Flying Dog's label qualifies as obscene or even indecent.[2] The word "bitch" is common

---

[2]Obscenity includes "works which, taken as a whole, appeal to the prurient interest in sex,
which portray sexual conduct in a patently offensive way, and which, taken as a whole, do not
have serious literary, artistic, political, or scientific value." *Miller* v. *California*, 413 U.S. 15, 24
(1973). "[T]he normal definition of 'indecent' merely refers to nonconformance with accepted

enough in acceptable usage. As of this writing, searching "bitch" in Amazon.com's book section returns 3,416 titles, including STITCH N' BITCH, a series of knitting books; POOR LITTLE BITCH GIRL, best-selling author Jackie Collins' latest mass market paperback; BITCHFEST: TEN YEARS OF CULTURAL CRITICISM FROM THE PAGES OF BITCH MAGAZINE, and many self-help books.

The protection afforded Flying Dog's speech is not diminished simply because it graces beer bottles. The First Amendment controls Michigan's Twenty-First Amendment authority to regulate alcohol. *44 Liquormart, Inc.* v. *Rhode Island*, 517 U.S. 484, 515-16 (1996); *cf. Rubin* v. *Coors Brewing Co.*, 514 U.S. 476 (1995) (beer label as protected speech). The Sixth Circuit confirmed that Defendant MLCC's authority to regulate alcohol neither overrides the First Amendment, *G & V Lounge, Inc.* v. *Michigan Liquor Control Commission*, 23 F.3d 1071, 1079 (6th Cir. 1994), nor excuses the need to assert a specific compelling interest justifying speech restrictions. *Hamilton's Bogarts, Inc.* v. *State of Michigan*, 501 F.3d 644, 653 (6th Cir. 2007).[3] Nor may Defendants condition Flying Dog's beer license upon unconstitutional speech restrictions. "[A] state actor cannot constitutionally condition the receipt of a benefit, such as a liquor license . . . on an agreement to refrain from exercising one's constitutional rights, especially one's right to free expression." *G & V Lounge*, 23 F.3d at 1077 (citations omitted).

The classification of Flying Dog's label as either "commercial" or "non-commercial" speech would not alter the outcome. *Bolger* v. *Youngs Prods. Corp.*, 463 U.S. 60, 71-72 (1983);

---

standards of morality." *Pacifica*, 438 U.S. at 740 (footnote omitted). The First Amendment protects indecency. *Sable Communications of Cal., Inc.* v. *FCC*, 492 U.S. 115, 126 (1989).

[3]Under the First Amendment, Defendant MLCC's regulation of alcohol-related speech has also fared poorly before Michigan's intermediate appellate court, *Michigan Beer & Wine Wholesalers' Ass'n* v. *Attorney General*, 142 Mich. App. 294 (1985), and the state's attorney general, *Mich. Atty. Gen. Op.* No. 7146, 2004 Mich. AG LEXIS 4 (Jan. 8, 2004).

*Carey* v. *Population Servs. Int'l*, 431 U.S. 678, 701 n.28 (1977); *see discussion infra*. The First

Amendment provides significant protection to commercial as well as non-commercial speech.

Nonetheless, because such classifications trigger different analytical frameworks, Plaintiff is

constrained to address the issue by noting that the RAGING BITCH label is not strictly commercial.

 "Speech is protected even though it is carried in a form that is sold for profit . . .The fact

that expressive materials are sold does not diminish the degree of protection to which they are

entitled under the First Amendment." *ETW Corp.* v. *Jireh Publ'g, Inc.*, 332 F.3d 915, 924-25

(6th Cir. 2003) (citations omitted). Just as Steadman enjoys full First Amendment protection in

distributing his art and accompanying text, so, too, does Flying Dog in publishing it on a beer

bottle. "Publishers disseminating the work of others who create expressive materials also come

wholly within the protective shield of the First Amendment." *Id.* at 925 (citation omitted).

 "[T]he core notion of commercial speech [is] speech which does *no more* than propose a

commercial transaction." *Bolger*, 463 U.S. at 66 (emphasis added) (citations and internal

quotation marks omitted). Commercial speech is "expression related *solely* to the economic

interests of the speaker and its audience." *Michigan Beer & Wine Wholesalers*, 142 Mich. App. at

302 (quoting *Central Hudson Gas & Electric Corp* v. *Pub. Svc. Comm'n of New York*, 447 U.S.

557, 561 (1980) (emphasis added) (other citation omitted)).

 While the RAGING BITCH trade-name is, as such, commercial speech, the label at issue

does more than identify the product and offer its sale. The label communicates Flying Dog's

"gonzo" message, and contains significant independent artistic and literary expression.

Consumers are drawn to Flying Dog's beer not merely by the trade-name text, but owing to the

label's non-commercial aspects. Regrettably, Defendants were drawn to the label for the same

14

reasons, taking issue with Steadman's copy, and even identifying the target of their censorship—in counsel's words, "a tenor, if you will, to the promotion"—on Plaintiff's website.

"[E]ven assuming" that speech "in the abstract is indeed merely 'commercial,' we do not believe that the speech retains its commercial character when it is inextricably intertwined with otherwise fully protected speech." *Riley* v. *Nat'l Fed'n of Blind*, 487 U.S. 781, 796 (1988). Accordingly, determining that the RAGING BITCH label is commercial speech would not preclude its evaluation as non-commercial expression.

      B.      Content-Based Restrictions On Protected Speech Are Strongly Disfavored.

"Premised on mistrust of governmental power, the First Amendment stands against attempts to disfavor certain subjects or viewpoints." *Citizens United* v. *FEC*, 130 S. Ct. 876, 898 (2010). "[A]s a general matter, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *United States* v. *Stevens*, 130 S. Ct. 1577, 1584 (2010) (citations omitted).

"[T]he essence of content-based regulation" is that "[i]t 'focuses *only* on the content of the speech and the direct impact that speech has on its listeners.'" *United States* v. *Playboy Entm't Group*, 529 U.S. 803, 811-12 (2000) (citation omitted). "Where a regulation is content-based, it is 'considered presumptively invalid and subject to strict scrutiny.'" *Hamilton's Bogarts*, 501 F.3d at 653 (quoting *City of Los Angeles* v. *Alameda Books*, 535 U.S. 425, 434 (2002)). The standard "requires the Government to prove that the restriction 'furthers a compelling interest and is narrowly tailored to achieve that interest." *Citizens United*, 130 S. Ct. at 898 (citation omitted). In applying the First Amendment, courts "must give the benefit of any doubt to protecting rather than stifling speech." *Id.* at 891 (citation omitted).

"In light of the greater potential for deception or confusion in the context of certain advertising messages, content-based restrictions on commercial speech may be permissible." *Bolger*, 463 U.S. at 65 (citations omitted). "[T]he protection provided to commercial speech is nevertheless considerable." *Pagan* v. *Fruchey*, 492 F.3d 766, 770 (6th Cir. 2007) (en banc).

> The commercial marketplace, like other spheres of our social and cultural life, provides a forum where ideas and information flourish. Some of the ideas and information are vital, some of slight worth. But the general rule is that the speaker and the audience, not the government, assess the value of the information presented.

*Edenfield* v. *Fane*, 507 U.S. 761, 767 (1993). In any event, as noted *supra*, commercial speech is fully protected when it is "inextricably intertwined" with non-commercial elements. "[T]he State retains less regulatory authority when its commercial speech restrictions strike at 'the substance of the information communicated' rather than the 'commercial aspect of [it] -- with offerors communicating offers to offerees.'" *44 Liquormart*, 517 U.S. at 499 (citations omitted).

Reviewing commercial speech, "a court first determines whether the speech concerns unlawful activity or is misleading." *Int'l Dairy Foods Ass'n* v. *Boggs*, 622 F.3d 628, 636 (6th Cir. 2010) (citing *Central Hudson*, 447 U.S. at 566). If not, the court inquires "(1) whether the asserted governmental interest is substantial, (2) whether the regulation directly advances that interest, and (3) whether the regulation is more extensive than necessary to serve the asserted interest." *Id.* "It is well established that 'the party seeking to uphold a restriction on commercial speech carries the burden of justifying it.'" *Edenfield*, 507 U.S. at 770 (citation omitted).

Defendants' labeling rule plainly restricts speech based on its content. Flying Dog's label expresses more than the proposition of a commercial transaction, but in any event is neither misleading nor related to unlawful activity. The First Amendment violation is manifest.

16

C.     Flying Dog's Label Cannot Be Censored for Allegedly Giving Offense.

Censors have long sought to justify their conduct by asserting a need to protect the public from offensive speech. And with few specific exceptions not here relevant (obscenity, or intrusive channels of indecency), courts have rejected that rationale. Regardless of the level of scrutiny, Defendants lack any interest—let alone a compelling or substantial one—to regulate the content of speech for conformance with their sensibilities. The Supreme Court has repeatedly rejected the notion that classifying speech as "commercial" provides the government any valid interest to counter "offensiveness." *Bolger*, 463 U.S. at 71-72; *Carey*, 431 U.S. at 701 n.28.

"At least where obscenity is not involved, we have consistently held that the fact that protected speech may be offensive to some does not justify its suppression." *Reno* v. *ACLU*, 521 U.S. 844, 874-75 (1997) (quoting *Carey*, 431 U.S. at 701); *Sambo's Restaurants, Inc.* v. *Ann Arbor*, 663 F.2d 686, 695 (6th Cir. 1981). "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Snyder* v. *Phelps*, 131 S. Ct. 1207, 1219 (2011) (quoting *Texas* v. *Johnson*, 491 U.S. 397, 414 (1989)); *Hamilton's Bogarts*, 501 F.3d at 653. "Indeed, 'the point of all speech protection . . . is to shield just those choices of content that in someone's eyes are misguided, or even hurtful." *Id.* (quoting *Hurley* v. *Irish-American Gay, Lesbian and Bisexual Group of Boston, Inc.*, 515 U.S. 557, 574 (1995)).

> The fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection. For it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas.

*Hustler*, 485 U.S. at 55-56 (citation omitted).

17

Defendants' concern that sensitive individuals might come across Flying Dog's label in public is a classic example of an impermissible censorship interest.

> In most circumstances, the Constitution does not permit the government to decide which types of otherwise protected speech are sufficiently offensive to require protection for the unwilling listener or viewer. Rather, . . . the burden normally falls upon the viewer to avoid further bombardment of [his] sensibilities simply by averting [his] eyes.

*Snyder*, 131 S. Ct. at 1220 (citation omitted); *Spence* v. *Washington*, 418 U.S. 405, 412 (1974) ("Anyone who might have been offended could easily have avoided the display."). "Where the designed benefit of a content-based speech restriction is to shield the sensibilities of listeners, the general rule is that the right of expression prevails, even where no less restrictive alternative exists." *Playboy*, 529 U.S. at 813. Directly on-point stands *Hornell Brewing Co.* v. *Brady*, 819 F. Supp. 1227 (E.D.N.Y. 1993), striking down a ban on "Crazy Horse" malt liquor. The government's "desire to abate or avert the perceived offensiveness of the Crazy Horse name . . . would not constitute a substantial interest." *Id.*, at 1235.

The government's ability "to shut off discourse solely to protect others from hearing it is . . . dependent upon a showing that substantial privacy interests are being invaded in an essentially intolerable manner." *Snyder*, 131 S. Ct. at 1220 (citation omitted). The government may not "prohibit speech as intrusive unless the 'captive' audience cannot avoid objectionable speech.'" *Bolger*, 463 U.S. at 72 (citation omitted).

"As a general matter, we have applied the captive audience doctrine only sparingly to protect unwilling listeners from protected speech." *Snyder*, 131 S. Ct. at 1220. If the government cannot prevent the display of obscenity within a courthouse, to which sensitive individuals might have been legally summoned, *Cohen*, *supra*, it surely cannot prevent RAGING BITCH from being

18

displayed on store shelves because some hypothetical shopper might find the label offensive.

Under either strict scrutiny or the *Central Hudson* commercial speech test, the absence of a valid

governmental interest supporting the censorship establishes the constitutional violation.

> D.  Even Were Defendants' Child-Protection Interest At Issue, Censorship of Flying
>     Dog's Label Does Not Substantially Advance Child Protection Interests.

Because children require greater legal protection than adults, their potential presence is

frequently invoked on behalf of attempts to stifle individual freedom. Not surprisingly,

Defendant Gagliardi sought to justify his censorship by declaring that "children . . . go to the

supermarkets, they go to the party stores with their parents and yes, although beers are in a

certain area, they still walk by them." Exh. C, p. 17.

Courts recognize a compelling governmental interest in "shielding minors from the

influence of literature that is not obscene by adult standards," and "protecting children from

harmful materials." *Bad Frog Brewery, Inc.* v. *New York State Liquor Authority,* 134 F.3d 87, 98

(2d Cir. 1998) (citations omitted). But no aspect of the RAGING BITCH label is harmful to

children. As George Carlin noted in his "Filthy Words" monologue, "bitch" is not even among

the words targeted by federal broadcast decency standards. *Pacifica*, 438 U.S. at 751 (appendix).

Neither is "bastard," *id.*, whose literal definition may be more difficult to explain to a child—but

Defendants license the Founders Brewing Company of Grand Rapids to make and sell "Dirty

Bastard" and "Backwoods Bastard" beer, and permit Stone Brewing's "Arrogant Bastard Ale."

But even were the RAGING BITCH label harmful to children, prohibiting this particular

expression would not substantially advance the state's child protection interests. The

government's substantial advancement burden

> is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them *to a material degree*. Consequently, the regulation may not be sustained if it provides only ineffective or remote support for the government's purpose.

*Greater New Orleans Broad. Ass'n* v. *United States*, 527 U.S. 173, 188 (1999) (citations and internal quotation marks omitted) (emphasis added). Precedent "requires more from the government than bald assertions that a particular speech restriction serves its articulated interests." *Pagan*, 492 F.3d at 772.

Even accepting Defendants' characterization of the RAGING BITCH label, it is difficult to imagine Defendants presenting actual evidence that banning RAGING BITCH beer will substantially reduce Michigan children's exposure to profanity. The ban hardly dents children's exposure to the word "bitch." Flying Dog did not introduce the word into the language.

Particularly instructive is the Second Circuit's decision in *Bad Frog*, striking down New York's censorship of a beer label featuring a cartoon frog's suggestively-obscene finger gesture. The court accepted New York's argument that it had sought to shield children from profane speech, but found that attacking one vulgar beer label did not materially advance this interest:

> In view of the wide currency of vulgar displays throughout contemporary society, including comic books targeted directly at children, barring such displays from labels for alcoholic beverages cannot realistically be expected to reduce children's exposure to such displays to any significant degree . . .

*Bad Frog*, 134 F.3d at 99 (footnote omitted). Censoring Bad Frog's label might have advanced the state's interest had it been part of a comprehensive anti-vulgarity legal program, but the

> isolated response to the perceived problem, applicable only to labels on a product that children cannot purchase, does not suffice. . .a state must demonstrate that its commercial speech limitation is part of a substantial effort to advance a valid state interest, not merely the removal of a few grains of offensive sand from a beach of vulgarity.

20

*Bad Frog*, 134 F.3d at 100 (footnote omitted). Banning "Crazy Horse" malt liquor, while allowing other Native American names for alcoholic beverages, likewise failed to materially advance any interest in reducing drinking by Native Americans. *Hornell*, 819 F. Supp. at 1238.

> E.  Even if Censoring Flying Dog's Label Substantially Advanced A Governmental Interest, the Ban Is More Extensive than Necessary, and Not Narrowly Tailored.

If banning the RAGING BITCH label substantially advanced some compelling interest in shielding children from profanity, the ban would still be unconstitutional, as both the commercial and non-commercial speech tests mandate that regulations be narrowly tailored—and preventing all adults from all access to RAGING BITCH is hardly a narrowly tailored restriction.

As a matter of strict scrutiny, the Supreme Court held over fifty years ago that child-protection interests cannot justify a complete ban on adult speech:

> The State insists that, by thus quarantining the general reading public against books not too rugged for grown men and women in order to shield juvenile innocence, it is exercising its power to promote the general welfare. Surely, this is to burn the house to roast the pig.

*Butler* v. *Michigan*, 352 U.S. 380, 383 (1957). Striking down a law banning all printed matter that might corrupt youth, the Supreme Court found the "legislation not reasonably restricted to the evil with which it is said to deal. The incidence of this enactment is to reduce the adult population of Michigan to reading only what is fit for children." *Butler*, 352 U.S. at 383. Consistent with *Butler*, Michigan does not ban the sale of SWITCH BITCH, a collection of short stories, including "Bitch," by beloved children's author Roald Dahl. Notwithstanding that children browsing a bookstore might be excited to pick up a book by the author of JAMES AND THE GIANT PEACH and CHARLIE AND THE CHOCOLATE FACTORY, nobody would seriously suggest banning Dahl's adult title because it contains the word "bitch."

21

For the same reason, broad bans on commercial speech, based on child-protection interests, likewise fail. *See, e.g. Dunagin* v. *Oxford*, 718 F.2d 738 (5th Cir. 1983) (en banc); (presence of children does not justify prohibiting liquor advertising); *Lorillard Tobacco Co.* v. *Reilly*, 533 U.S. 525, 564 (2001) (same: tobacco advertising). Notwithstanding that children might read mail entering their homes, the Supreme Court struck down a ban on the mailing of commercial speech concerning contraception, declaring, "[t]he level of discourse reaching a mailbox simply cannot be limited to that which would be suitable for a sandbox." *Bolger*, 463 U.S. at 74.

> *Bad Frog* is again on-point:
>
>> Even if we were to assume that the state materially advances its asserted interest by shielding children from viewing the Bad Frog labels, it is plainly excessive to prohibit the labels from all use, including placement on bottles displayed in bars and taverns where parental supervision of children is to be expected. Moreover, to whatever extent NYSLA is concerned that children will be harmfully exposed to the Bad Frog labels when wandering without parental supervision around grocery and convenience stores where beer is sold, that concern could be less intrusively dealt with . . .

*Bad Frog*, 134 F.3d at 101. Michigan forbids children from visiting many places where alcohol is sold. Mich. Comp. Laws § 750.141. Of course, unlike the *Bad Frog* label, the Raging Bitch label does not suggest obscenity. And although Flying Dog rejects the notion that its label is exclusively commercial in character, Defendants' lack of narrow tailoring dooms their censorial venture regardless of whether the Court applies commercial or non-commercial speech standards.

* * *

In sum, Defendants' censorship of Raging Bitch clearly violates the First Amendment. Suppressing protected speech for the purpose of preventing offense is simply forbidden— securing delicate sensibilities is not a valid governmental interest, and Flying Dog is not invading

22

anyone's privacy. Children might be protected from adult speech, but there is nothing profane about the label. Even if there were, banning RAGING BITCH for all adults would be regulatory overkill, and do nothing to advance a campaign against child-directed profanity, if one existed.

## IV.    INJUNCTIVE RELIEF IS NECESSARY TO AVERT IRREPARABLE HARM.

"[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Jones*, 569 F.3d at 277 (citations omitted). Indeed, "[e]ven minimal infringements upon First Amendment values constitutes irreparable injury sufficient to justify injunctive relief." *Id.* (citation omitted). And the injury in this case is hardly minimal, the RAGING BITCH label being entirely banned throughout the state. Injunctive relief is necessary to stop the irreparable injury.

## V.    THE BALANCE OF HARM FAVORS FLYING DOG, AS AN INJUNCTION WOULD NOT HARM DEFENDANTS.

While Flying Dog's irreparable injury—the loss of First Amendment freedoms—is significant, it is difficult to imagine any harm that might befall Defendants upon issuance of an injunction. Indeed, the balance of harms test is designed to allow injunctions where a plaintiff cannot show a strong likelihood of ultimate success, "but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if the injunction is issued." *Jones*, 569 F.3d at 277 (citation omitted). Flying Dog has done more than demonstrated the existence of serious questions, but it has done at least as much. The balance of harms thus favors the granting of injunctive relief.

VI.     THE PUBLIC INTEREST FAVORS IMMEDIATE INJUNCTIVE RELIEF.

"[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jones*, 569 F.3d at 278 (citation omitted). "[I]n First Amendment cases, the determination of where public interest lies is dependent on a determination of the likelihood of success on the merits of the First Amendment challenge, because if the regulation in question is likely to be deemed constitutional, the public interest will not be harmed by its enforcement." *Id.* (citations and internal punctuation omitted). But "because 'the public as a whole has a significant interest in ensuring . . . protection of First Amendment liberties . . . the public interest would be advanced by issuance of a preliminary injunction enjoining enforcement of those portions of challenged statutes that are of questionable constitutionality.'" *Id.* (citation omitted).

Because Defendants' arbitrary content-based restriction on beer label speech violates the First Amendment, enjoining that regulation is in the public interest.

VII.    THE INJUNCTION SHOULD ISSUE WITHOUT REQUIRING SECURITY.

"[T]he district court possesses discretion over whether to require the posting of security." *Moltan Co.* v. *Eagle-Picher Indus.*, 55 F.3d 1171, 1176 (6th Cir. 1995) (citation omitted). Because an injunction could not cause any financial harm to Defendants—indeed, the injunction would mitigate Defendants' damages—no bond should be required.

CONCLUSION

The First Amendment is incompatible with the notion that government regulators may sit in judgment of a beer label, scrutinizing it for conformance to their personal views on what sort of expression might disturb delicate sensibilities. And while children should be shielded from harmful material, a successful childhood prepares individuals for participation in a free and open society that tolerates a broad spectrum of human expression—including Flying Dog's "gonzo" beer labels. That much is guaranteed by the First Amendment.

Plaintiff respectfully requests that its motion for preliminary injunctive relief be granted.

Dated: April 13, 2011            Respectfully Submitted,

Alan Gura
GURA & POSSESSKY, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA 22314
703.835.9085/Fax: 703.997.7665
alan@gurapossessky.com

By:    /s/ Alan Gura
       Alan Gura

Attorneys for Plaintiff Flying Dog Brewery, LLLP

25