UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

FLYING DOG BREWERY, LLLP,

     Plaintiff,

                                     No. 1:11-cv-307

v

                                     HON. ROBERT J. JONKER

MICHIGAN LIQUOR CONTROL COMMISSION,
NIDA SAMONA, DONALD WEATHERSPOON,
PATRICK GAGLIARDI, COLLEEN POBUR, and     ORAL ARGUMENT REQUESTED
EDWARD GAFFNEY,

     Defendants.

---

| | |
|---|---|
| Alan Gura | BILL SCHUETTE (P32532) |
| Gura & Possessky, PLLC | Attorney General |
| Attorney for Plaintiff | DONALD MCGEHEE (P37489) |
| 101 N. Columbus Street, Suite 405 | GERALD WHALEN (P44084) |
| Alexandria, VA  22314 | MELINDA A. LEONARD (P63638) |
| (703) 835-9085 | Assistant Attorneys General |
| alan@gurapossessky.com | Alcohol & Gambling Enforcement |
| | Division |
| | Attorneys for Defendants |
| | 525 W. Ottawa, Fifth Floor |
| | PO Box 30736 |
| | Lansing, MI  48909 |
| | (517) 241-0210 |
| | Mcgeheed1@michigan.gov |

---/

## BRIEF IN SUPPORT OF DEFENDANTS' RESPONSE IN OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION

                          Bill Schuette
                          Attorney General

                          s/ Donald McGehee
                          Donald McGehee (P37489)
                          Assistant Attorney General
                          Attorneys for Defendants
                          Mcgeheed1@michigan.gov

Dated:  May 5, 2011

# TABLE OF CONTENTS

Page

Index of Authorities ...................................................................................................... ii

Introduction ................................................................................................................... iv

Factual Background ....................................................................................................... 1

Argument ....................................................................................................................... 4

I.     Flying Dog cannot demonstrate a strong likelihood of success on the merits. ................... 5

     A.  Flying Dog's First Amendment Claims ....................................................... 5

     B.  Flying Dog's void-for-vagueness claim ..................................................... 15

II.    Flying Dog has not demonstrated irreparable harm. ........................................ 16

III.   The balancing of harms favors Defendants. ..................................................... 16

IV.   The public interest does not favor issuing a preliminary injunction. ................ 17

Conclusion and Relief Sought ...................................................................................... 18

# INDEX OF AUTHORITIES

Page

## Cases

*Bad Frog Brewery, Inc v. New York State Liquor Authority*,
134 F.3d 87 (1998)............................................................................................................ passim

*Bd of Trustees of the State University of New York v. Fox*,
492 U.S. 469; 109 S. Ct. 3028; 106 L. Ed. 2d 388 (1989)........................................................ 6

*Bolger v. Youngs Drug Products Corp*,
463 U.S. 60; 103 S. Ct 2875; 77 L. Ed. 2d 469 (1983)............................................................. 5

*Bonnell v. Lorenzo*,
241 F.3d 800 (6th Cir. 2001) ............................................................................................... iv

*Butler v. Michigan*,
352 U.S. 380 (1957)............................................................................................................ 13

*Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*,
447 U.S. 557; 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980)...................................................... 5, 7

*City of Cincinnati v. Discovery Network, Inc.*,
507 U.S. 410; 113 S. Ct. 1505; 123 L. Ed. 2d 99 (1993)......................................................... 7

*Edenfield v. Fane*,
507 U.S. 761; 113 S. Ct. 1792; 123 L. Ed. 2d 543 (1993)....................................................... 8

*F.C.C. v. Pacifica Foundation*,
438 U.S. 726; 98 S. Ct. 3026; 57 L. Ed. 2d 1073 (1978)....................................................... 14

*Florida Bar v. Went For It, Inc.*,
515 U.S. 618; 115 S. Ct. 2371; 132 L. Ed. 2d 541 (1995)....................................................... 5

*Hunt v. City of Los Angeles*,
2011 U.S. App. LEXIS 5721 .............................................................................................. 15

*Miller v. City of Cincinnati*,
622 F.3d 524 (6th Cir. 2010) .............................................................................................. 15

*Nike, Inc. v. Kasky*,
538 U.S. 654; 123 S. Ct. 2554; 156 L. Ed. 2d 580 (2003)...................................................... 6

*Nutritional Health Alliance v. Shalala*,
144 F.3d 220 (2nd Cir. 1998).............................................................................................. 15

ii

*Overstreet v. Lexington-Fayette Urban County Government*,
305 F.3d 566 (6th Cir. 2002) ................................................................... 4

*Rubin v. Coors Brewing Co.*,
514 U.S. 476; 115 S. Ct. 1595; 131 L. Ed. 2d 532 (1995)........................ 7

*Sable Communications of California, Inc. v. Federal Communications Commission* ,
492 U.S. 115; 109 S. Ct. 2829; 106 L. Ed. 2d 93 (1989)...................... 14

*Smith Wholesale Co., Inc. v. R.J.R. Tobacco*,
477 F.3d 854 (6th Cir. 2007) ................................................................. 16

*United Food & Commercial Workers Union v. Southwest Ohio Regional Transit
Authority*,
163 F.3d 341 (6th Cir. 1998) ................................................................. 16

*United States v. Contents of Accounts*,
629 F.3d 601 (6th Cir. 2011) ................................................................... 4

*Village of Hoffman Estates v. Flipside Hoffman Estates, Inc.*,
455 U.S. 489; 102 S. Ct. 186; 71 L. Ed. 2d 362 (1982)......................... 16

*Wag More Dogs, LLC v. Artman*,
2011 U.S.Dist. LEXIS 14642 ..................................................................... 5

*Ward v. Rock Against Racism*,
491 U.S. 781; 109 S. Ct. 2746; 15 L. Ed. 2d 661 (1989)....................... 16

*Wilson v. Lexington-Fayette Urban County Government*,
201 Fed. Appx. 316; 2006 U.S. App LEXIS 25617 (6th Cir. 2006) ........ 15

## Statutes and Rules

Mich. Comp. Laws § 436.1101 *et seq* ......................................................... 1

Mich. Comp. Laws § 436.1201(2) ................................................................ 1

Mich. Comp. Laws § 436.1203(1) ................................................................ 1

Mich. Comp. Laws § 436.1209(2) ................................................................ 1

Mich. Comp. Laws § 436.1209(7) ................................................................ 3

Mich. Comp. Laws § 600.631 ....................................................................... 3

Mich. Admin. Code r. 436.1609(2)(b) .......................................................... 1

Mich. Admin. Code r. 436.1611(1)(d) .......................................................... 2

## INTRODUCTION

"A preliminary injunction is an extraordinary measure that has been characterized as one of the most drastic tools in the arsenal of judicial remedies."[1]  Nevertheless, Plaintiff, Flying Dog Brewery, LLLP, (Flying Dog) insists on unleashing its "Raging Bitch" on Michigan's public well before a proper determination of this case.  Consistent with the plea for release on its label, Flying Dog wants the Court to jump ahead of deliberate analysis in this case and rush to grant it relief.  But a matter as weighty as this must be handled in a restrained, thoughtful manner.  A preliminary injunction here would inflict this detrimental and admittedly inflammatory[2] language on captive audiences throughout Michigan, a harm that cannot be undone.

---

[1] *Bonnell v. Lorenzo*, 241 F.3d 800, 808 (6th Cir. 2001) (citations and internal quotation marks omitted).

[2] See Raging Bitch label text:  "Two inflammatory words . . . one wild drink. . . ."  (Exhibit 1).  Exhibit 1 includes the label as submitted to the Liquor Control Commission.  Although the wording is the same as the version of the label Plaintiff submitted to the Court, the font used in the text differs.  A full-color copy of the label is also included in Exhibit 1 for ease of reading.

**FACTUAL BACKGROUND**

The Michigan Liquor Control Commission (Commission) possesses the "sole right, power, and duty to control the alcoholic beverage traffic," including the sale of alcoholic beverages, in this State.[3]  Generally, the sale of alcoholic liquor in Michigan cannot take place unless the Commission authorizes it.[4]  Exercising its authority under the Michigan Liquor Control Code of 1998 (the Code),[5] the Commission has promulgated administrative rules aimed at fulfilling its duty to control alcoholic beverage traffic.  Among those rules are provisions concerning licensing sellers and approving or registering licensed sellers' products.  Although the Commission consists of five members, a three-member subset of the Commission, deemed Administrative Commissioners, has the responsibility for decisions "relating to licensing, purchasing, enforcement, merchandising, and distribution."[6]

Flying Dog has been issued an "outstate seller of beer" license.[7]  To be able to sell each variety of its beers, however, Flying Dog also has to obtain a registration number for the product and receive Commission approval to sell it.[8]

> The sale of beer is prohibited in this state unless all of the following provisions are complied with:
>
> (a) The beer is packaged, marked, branded, and labeled in accordance with these rules.
>
> (b) The beer label truthfully describes the contents of the container in accordance with these rules and the federal alcohol administration act of 1935, 27 U.S.C.

---

[3] Mich. Comp. Laws § 436.1201(2).

[4] Mich. Comp. Laws § 436.1203(1).

[5] Mich. Comp. Laws § 436.1101 *et seq.*

[6] Mich. Comp. Laws § 436.1209(2).  The administrative commissioners involved in this matter are Commissioners Samona, Gagliardi, and Weatherspoon.  Commissioners Pobur and Gaffney had no part in the decisions that are a subject of this lawsuit.

[7] See Mich. Admin. Code r. 436.1609(2)(b) (stating that "[a]n outstate seller of beer license shall be issued to . . . [a] manufacturer located outside this state, but in the United States, that manufactures and packages its own beer").

[8] See Mich. Admin. Code r. 436.1611.

§201 et seq., and the regulations there under, being 27 C.F.R. part 7, subpart C. The provisions of 27 C.F.R. part 7, subpart C, are adopted by reference in these rules. . . .

(c) The beer has received a registration number from the commission and has been approved for sale by the commission.

(d)  The commission may disapprove any beer label submitted for registration that is deemed to promote violence, racism, sexism, intemperance, or intoxication or to be detrimental to the health, safety, or welfare of the general public.

Flying Dog requested Commission approval of Raging Bitch in September 2009.  As part of that application, it submitted a copy of the product's label.  A quorum of the Administrative Commissioners, pursuant to their authority under the foregoing rule, reviewed the label and voted to deny the registration request.  Its order states that the Commission denied the request for registration "pursuant to [Mich. Admin. Code r.] 436.1611(1)(d) after review and consideration of the proposed label which includes language deemed detrimental to the health, safety, or welfare of the general public."

In its letter informing Flying Dog of its decision, the Commission noted that if Flying Dog wanted to appeal the decision, it needed to do so within 20 days.[9]  Flying Dog did not request an appeal within that time frame.  Rather, its compliance attorney, Annie Tunheim, requested an appeal in a letter dated March 16, 2010.[10]  Tunheim objected to the Commission's initial decision, contending that the label was referring only to a female dog.  But she conceded that "[i]f the word 'bitch' had [been] used in correlation with a picture of a woman, I can see how one might conclude that the use was detrimental to the health, safety or welfare of the general

---

[9]Commission Letter dated November 23, 2009 (Exhibit 2).
[10]Letter from Annie Tunheim, Flying Dog's Compliance Attorney, dated March 16, 2010 (Exhibit 3).

public."[11]  Despite the delay, the Commission granted the request and conducted an appeal

hearing before a two-member quorum of the Administrative Commissioners on April 22, 2010.[12]

During the hearing, Flying Dog's Chief Executive Officer, James Caruso, recognized his

company was taking a risk:  "We also like the name because . . . it was kind of at the edge of the

box."[13]  "It's an edgy label, no doubt . . . ." [14]  He also repeatedly attempted to explain away the

product's offensive name, repeatedly contending that it pertains to a female dog, not to a

woman.[15]  Caruso asserted that "[t]he last thing [he] would ever want to do is do anything

degrading or humiliating to people.  We saw this as just amusing."[16]  Commissioner

Weatherspoon noted the offensive text that went beyond the product's name:  "Remember,

enjoying a Raging Bitch, unleashed, untamed, unbridled and in heat, is pure Gonzo!"[17]   Further,

Commissioner Gagliardi stressed that, in his term as a Commissioner, the Administrative

Commissioners "have not been willing to put this particular five-letter word on the front of the

box."[18]  Commissioners Gagliardi and Weatherspoon affirmed the prior order in an order dated

July 7, 2010.[19]  Although Michigan law provides Flying Dog with an appeal to State Circuit

Court, it did not appeal the Commission's ruling.[20]

---

[11] *Id.*
[12] See Mich. Comp. Laws § 436.1209(7).
[13] Michigan Liquor Control Commission Transcript, Flying Dog Brewery, LLLP, Label Appeal, April 22, 2010 at 8 (Exhibit 4).
[14] Transcript at 5.
[15] Transcript at 6, 15.
[16] Transcript at 8.
[17] Transcript at 15.
[18]Transcript at 16.
[19] See Michigan Liquor Control Commission,"Findings and Order" dated July 7, 2010 (Exhibit 5).
[20] Mich. Comp. Laws § 600.631.

# ARGUMENT

"We will sell no wine before its time," famously claimed the Paul Masson Winery in its television commercials years ago. Here, Flying Dog asks this Court to resolve the issues in this case before their time. Through this motion, Flying Dog requests an injunction prohibiting the enforcement of the beer labeling approval rule against the sale of Raging Bitch before any discovery has taken place. But this case raises numerous issues of constitutional importance that must be considered deliberately with the benefit of a fully developed record.

A preliminary injunction is an extraordinary remedy "which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it."[21] The Plaintiff must satisfy a level of proof "much more stringent than the proof required to survive a summary judgment motion" to show that the requested relief is required.[22] As explained below, Flying Dog has not sustained its extraordinary burden and should not be granted this extraordinary relief.

Determining whether to grant an injunction requires the Court to examine and weigh four well-known factors:

> (1) whether the moving party has a strong likelihood of success on the merits; (2) whether the moving party will suffer irreparable injury without the injunction; (3) whether the issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction.[23]

---

[21] *Overstreet v. Lexington-Fayette Urban County Government*, 305 F.3d 566, 573 (6th Cir. 2002).
[22] *Overstreet*, 305 F.3d at 573.
[23] *United States v. Contents of Accounts*, 629 F.3d 601 (6th Cir. 2011), quoting *Jones v. City of Monroe,* 341 F.3d 474, 476 (6th Cir. 2003).

I.  **Flying Dog cannot demonstrate a strong likelihood of success on the merits.**

A.  **Flying Dog's First Amendment Claims**

"[T]he First Amendment does not guarantee the right to express oneself at all times and places and in any manner that a person may wish."[24]  And even if speech is protected, it may not receive the full protection intended for core political issues on matters of public concern.  The United States Supreme Court has long recognized that some categories of speech merit lessened constitutional protection.  Among those categories is commercial speech, given that it is both less valuable and more durable than core political speech.[25]  "Commercial speech enjoys a limited measure of protection, commensurate with its subordinate position in the scale of First amendment values, and is subject to modes of regulation that might be impermissible in the realm of noncommercial expression."[26]

Because different categories of speech merit different levels of protection, the reviewing Court must determine the proper classification of the speech.[27]  Flying Dog contends that the Raging Bitch label deserves the full constitutional protection afforded to core political speech merely because the label does more than identify the product and offer its sale.  The law on this issue states otherwise.

---

[24] *Wag More Dogs, LLC v. Artman*, 2011 U.S.Dist. LEXIS 14642 at 12, citing *Heffron v. Int'l Soc'y. for Krishna Consciousness, Inc.*, 452 U.S. 640, 647; 101 S. Ct. 2559, 69 L. Ed. 2d 298 (1981).

[25] *Central Hudson Gas & Elec. Corp. v. Public Serv. Comm'n of N.Y.*, 447 U.S. 557; 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980); see also *Bolger v. Youngs Drug Products Corp*, 463 U.S. 60, 64-65; 103 S. Ct 2875; 77 L. Ed. 2d 469 (1983) (stating that "the Constitution affords less protection to commercial speech than to other constitutionally safeguarded forms of expression").

[26] *Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 623; 115 S. Ct. 2371; 132 L. Ed. 2d 541 (1995) (quotation marks, brackets, and citations omitted).

[27] See *Bolger*, 463 U.S. at 64-65.

###### a.    The Raging Bitch label constitutes commercial speech.

When speech combines commercial and non-commercial elements, whether to treat it as commercial depends on factors such as:

(1) "whether the communication is in an advertisement";

(2) "whether the communication makes reference to a specific product"; and

(3) "whether the speaker has an economic motivation for the communication."[28]

Although "none of these factors alone would render the speech in question commercial, the presence of all three factors provides 'strong support' for such a determination."[29]

Flying Dog's attempt to characterize the Raging Bitch label as noncommercial speech quickly fails.  The label itself is an advertisement for the beer,[30] and Flying Dog definitely has an economic motivation for the communication.  Although Flying Dog contends that the label "communicates [its] 'gonzo' message and contains significant independent artistic and literary expression," these elements are still clearly commercial in nature, being aimed at drawing customers to purchase and drink Raging Bitch.  Regardless whether they hold any noncommercial character, these elements would not be substantial enough to convert Flying Dog's plea to purchase its product into noncommercial speech.[31]  Even if the speech at issue here

---

[28] *Bad Frog Brewery, Inc. v. New York State Liquor Authority*, 134 F.3d 87, 97 (1998), citing *Bolger*, 463 U.S. at 66-67.

[29] *Bad Frog Brewery,* 134 F.3d at 97, citing *Bolger*, 463 U.S. at 66-67.

[30] *Bad Frog Brewery*, 134 F.3d at 97.

[31] See *Bd of Trustees of the State University of New York v. Fox*, 492 U.S. 469, 474; 109 S. Ct. 3028; 106 L. Ed. 2d 388 (1989) (concluding that a discussion of "how to be financially responsible and . . . run an efficient home" during a Tupperware demonstration did not convert the demonstration to noncommercial speech).  But see *Nike, Inc. v. Kasky*, 538 U.S. 654, 663-664; 123 S. Ct. 2554; 156 L. Ed. 2d 580 (2003), where Justice Stevens, concurring in the decision to dismiss the writ of certiorari as improvidentially granted, stated that whether Nike's speech concerning its labor practices should be judged as commercial speech presented a novel issue that should not be addressed without development of a full factual record.

lies beyond the "core notion" of commercial speech,[32] it still constitutes the "proposal of a commercial transaction."[33]

As a result, this Court's review is properly focused on the four-part test in *Central Hudson Gas & Elec. Corp. v. Public Service Commission*[34] for evaluating regulations on commercial speech. For commercial speech to be protected,

> it at least must concern lawful activity and not be misleading. Next, we ask whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine whether the regulation directly advances the governmental interest asserted, and whether it is not more extensive than necessary to serve that interest.[35]

Regarding the first *Central Hudson* factor, at this stage in the case it does not appear that there is any thing unlawful about the speech or that is misleading as to the product being beer.

As for the second factor, several substantial interests support the Commission's regulation. The State has "a compelling interest in protecting the physical and psychological well-being of minors," including "shielding minors from the influence of literature that is not obscene by adult standards.[36] Additionally, Michigan has a substantial interest in regulating alcohol consumption and promoting temperance.[37] The State's interest in protecting the health, safety, and welfare of its citizens also rises to the level of satisfying the second *Central Hudson* factor.[38]

---

[32] *Bad Frog Brewery*, 134 F.3d at 97, citing *Bolger*, 463 U.S. at 66.

[33] See *City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 422; 113 S. Ct. 1505; 123 L. Ed. 2d 99 (1993).

[34] *Central Hudson Gas & Elec. Corp. v. Public Service Comm'n* , 447 U.S. 557; 100 S. Ct. 2343; 65 L. Ed. 2d 341 (1980).

[35] *Central Hudson*, 447 U.S. at 566.

[36] *Bad Frog Brewery,* 134 F.3d at 97, quoting *Sable Communications of California, Inc. v. Federal Communications Comm'n*, 492 U.S. 115, 126; 109 S. Ct. 2829; 106 L. Ed. 2d 93 (1989).

[37] *Bad Frog Brewery,* 134 F.3d at 97.

[38] *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 485; 115 S. Ct. 1595; 131 L. Ed. 2d 532 (1995).

Because these harms are real and are directly advanced by the regulation at issue, the third *Central Hudson* factor is also satisfied.[39] Subjecting Michigan's citizens, regardless of age, to this destructive label will cause them harm, as numerous resources show.

The use of the word "bitch" to refer to women reaches as far back as the 1400s.[40] In those times, as now, it was an insult that carried sexual implications: "The idea was that a woman being called a bitch was being accused of being worse than a prostitute because at least a prostitute stood to gain financially from the broad distribution of her sexual favors."[41] This appropriation of the term arose from its association with the Greek/Roman goddess Artemis-Diana, who, as goddess of the hunt, was frequently portrayed with dogs in artistic renderings.[42] "The etymology of 'bitch' as applied to women teaches us that the word was linked to suppressing images of women as powerful and divine and equating them with sexually depraved beasts."[43]

In modern times, "bitch" remains "a derogatory defamation of sex and gender."[44] In discussing the use of the word in the context of male rappers referring to each other as "bitches," "the sexist message is clear: one is compared to a (bitchy) woman, and there is nothing more demeaning than being compared to a woman."[45]

---

[39] See *Edenfield v. Fane*, 507 U.S. 761, 771; 113 S. Ct. 1792; 123 L. Ed. 2d 543 (1993) (reciting the requirement that the state show that its asserted harms are real).

[40] Sherryl Kleinman, Mathew B. Ezzell, and A. Corey Frost, *Reclaiming Critical Analysis: The Social Harms of "Bitch"*, 3 Sociological Analysis 47, 50 (2009) (Exhibit 6).

[41] Kleinman at 51 (quotation marks omitted).

[42] *Id.*

[43] *Id.*

[44] Mina Jasarevic, *B Please: Race, Class & Linguistics. Where Does The "Bitch" Stand Today?*, HIPHOP DX, posted January 22, 2010,
http://www.hiphopdx.com/index/editorials/id.1482/title.b-please-race-class-linguistics-where-does-the-bitch-stand-today.

[45] *Id.*

Oprah Winfrey recently took a stand against this damaging slur by banning its use on her new television network, "OWN."[46]  In January of this year, she announced that she wants her network to entertain "without tearing people down and calling them bitches."[47]  Her move was applauded by the Women's Media Center for "pioneering a safe space in this frequently misogynistic media landscape.  'Bitch' is a hateful word that degrades and dismisses women, and its use often aims at diminishing women's voices."[48]

In 2007 the "New York City Council, which drew national headlines when it passed a symbolic citywide ban . . . on the use of the so-called n-word, turned its linguistic (and legislative) lance toward a different slur: bitch."[49]  "The term is hateful and deeply sexist, said Councilwoman Darlene Mealy of Brooklyn, who has introduced a measure against the word, saying it creates "a paradigm of shame and indignity" for all women."[50]  At least 19 of 51 council members signed on to the ban.[51]

As words go, "bitch" may be just about as close to the "N"-word as descriptors for women get.  But Flying Dog wants Michigan's public, including its children, to see this label in grocery stores, where it would not be confined to liquor aisles.  Retailers may place alcohol for sale wherever they wish, including right next to cash registers, along with the candy.

---

[46] Jill Marcellus, *Oprah's New Network "OWN" Bans the Word "Bitch,"* posted October 29, 2010, http://womensmediacenter.com/blog/2010/10/oprah%E2%80%99s-new-network-%E2%80%9Cown%E2%80%9D-bans-the-word-bitch/.
[47] *Id.*
[48] *Id.*
[49] Michael M. Grynbaum, *It's a Female Dog, or Worse. Or Endearing. And Illegal?*, New York Times website, posted August 7, 2007, http://www.nytimes.com/2007/08/07/nyregion/07bword.html?ei=5090&en=8bb9b60b7da0d2ed&ex=1344139200&pagewanted=print.
[50]*Id.*
[51]*Id.*

Additionally, beer bottles may be sold in restaurants where customers who may choose this product dine closely with those who would want to avoid it.

Of course, Flying Dog's label doesn't just use the word "bitch." It couples it with the term "raging." Shockingly, Flying Dog would have this Court conclude that it is only making statements about dogs, not women. But consider these disparaging comments posted on the Internet: "Anne Hathaway might be a raging bitch."[52] "Solange Knowles is a raging bitch."[53] Jessica Alba goes "to Canada a couple a times a year to unleash the raging bitch from hell [she's] been bottling up for months on some of their irritatingly 'nice' locals."[54] "Hayden Panettiere is a Raging Bitch".[55] These statements are certainly not about dogs, and neither is the Raging Bitch label. The Raging Bitch label, as a whole, gives the impression that a woman's actions are subject to being controlled and then "unleashed" at someone else's whim.[56] Flying Dog's own description of Raging Bitch to an on-line beer reviewer betrays its claims that it is speaking about dogs and not women:

> Bitches come in a variety of forms, but there's never been something as sassy as Flying Dog's Raging Bitch Belgian IPA. An American IPA augmented with Belgian yeast, our 20th anniversary beer jumps out of the glass and nips at your taste buds with its delicate hop bitterness. At 8.3% ABV, this bitch is dangerously drinkable.[57]

Similarly, Mr. Caruso's statements at the appeal hearing reveal the charade. Mr. Caruso referred to the label as "amusing,"[58] but there is nothing amusing about the canine meaning of "bitch." Although the label proclaims its "inflammatory" nature, there is nothing inflammatory

---

[52] http://www.idontlikeyouinthatway.com/2008/09/anne-hathaway-is-a-diva.html.
[53] http://www.evilbeetgossip.com/2008/08/27/solange-knowles-is-a-raging-bitch/.
[54] http://gawker.com/#!194442/jessica-alba-canada-having-rapturous-hate-affair-with-jessica-alba.
[55] http://www.thehollywoodgossip.com/2009/03/report-hayden-panettiere-is-a-raging-bitch/
[56] See Samona Aff., paragraphs 6-7.
[57] http://www.thebrewsite.com/2011/01/11/raging-bitch.php.
[58] Transcript at 8 (Exhibit 4).

about the purely canine meaning of "bitch."  Mr. Caruso also analogized the term "Raging Bitch" to "brood bitch," but even that attempted rationalization fails.[59]  A "brood bitch" is a female dog being used for breeding, or producing a "brood."  The descriptor has nothing to do with the animal's temperament.

Even more repulsive and indicative of the reference to women is the illustration on the Raging Bitch label.  The teats more closely resemble a woman's breasts than a dog's mammary glands.[60]  Shockingly, the depiction of the dog's presented backside portrays a woman's vaginal area, nothing remotely similar to a dog's genitalia.[61]

Even the veterinary world is moving away from the term "bitch" because of its offensive nature:  "In scientific articles since 2005, the accepted term for an intact female canine (particularly when you refer to reproductive process) has become[] dam."[62]

> Bitch is no longer an acceptable word, now even in the canine world.  Outside this small circle, its dictionary definition might as well be the rude one . . . . [A]s you well know, it is a derogatory expression intended to disparage a woman's character (as in, "She's a raging bitch!").[63]

Additionally, a host of the Westminster Kennel Club dog show voiced concerned about the word.  "'I think we have to take responsibility for that word on the air.  The reality is it's in the realm of responsible conduct to not use that word anymore."[64]

Advocates against violence toward women also recognize the harm that this language can cause.

---

[59] Transcript at 13 (Exhibit 4).
[60] Dogs generally have 8 to 12 teats.  See http://classes.ansci.illinois.edu/ansc438/lactation/catsdogs.html
[61] See Samona Aff., paragraph 4 (Exhibit 7).
[62] Patty Khuly, VMD, MBA, *Dam Vs. Bitch: How Words Change in the Veterinary Lexicon*, posted August 17, 2006,  http://www.petmd.com/blogs/fullyvetted/2006/august/dam-vs-bitch-how-words-change-veterinary-lexicon.
[63] *Id.*
[64] Grynbaum, *supra*.

> Words are very powerful, especially when spoken by people with power over others. We live in a society in which words are often used to put women down, where calling a girl or woman a "bitch," "freak," "whore," "baby," or "dog" is common. Such language sends a message that females are less than fully human. When we see women as inferior, it becomes easier to treat them with less respect, disregard their rights, and ignore their well-being.[65]

The degree of advancement of the State's goals is particularly high here, where alcohol is involved. Use of intoxicants like alcohol often leads to irrational behavior, and the very name of this beverage, together with the label's other dehumanizing characteristics, combined with its consumption could motivate consumers toward destructive activity.[66] "Any terms that dehumanize others can make it easier for us to harm them. . . . "[67]

The present case is materially distinguishable from *Bad Frog Brewery* on this point.[68] In that case, the Second Circuit stated that removing "a few grains of offensive sand from a beach of vulgarity" did not materially advance the State's interest in protecting children.[69] In contrast to New York's prohibition of one beer label that did not even have a vulgar name, the Commission has repeatedly prohibited the use of "bitch" on beer and wine labels, as noted during the appeal hearing in this matter.[70] As Commissioner Gagliardi stated, "we have not been willing to put this particular five-letter word on the front of the box."[71] Commission Chairperson Samona's affidavit similarly supports this fact.[72]

---

[65] Men Against Abuse Now, *What Men Can Do to End Violence Against Women*, http://www.stanford.edu/group/maan/cgi-bin/?page_id=85.

[66] See Samona Aff. paragraph 15 (Exhibit 7).

[67] Kleinman at 48.

[68] Another material difference between the instant case and *Bad Frog Brewery* is that the Court was deciding a motion for summary judgment, not a motion for preliminary injunction. As previously stated, a plaintiff requesting a preliminary injunction must satisfy a higher burden of proof than one trying to survive summary judgment. *Overstreet*, 305 F.3d at 573.

[69] *Bad Frog Brewery*, 124 F.3d at 100.

[70] Transcript at 14 (Exhibit 4).

[71] Transcript at 16 (Exhibit 4).

[72] See Samona Aff. paragraph 13 (Exhibit 7).

The fourth *Central Hudson* factor assesses whether there is a reasonable fit between the State's interests and the means chosen to accomplish those interests.[73]  The fit does not have to be perfect or represent "the single best disposition"; rather, the scope of the restriction must be proportionate to the interest served.[74]  Further, the means employed do not have to be the least restrictive means available, but must only be narrowly tailored to achieve the government's goal.[75]  The government enjoys freedom within those bounds to determine what manner of regulation is appropriate.[76]

In light of the abusive nature of Flying Dog's product label, the means employed here are sufficiently narrow to serve the State's interests.  Unlike the circumstances in *Bad Frog Brewery*, confining this product to a particular shelf would not alleviate the harms it causes.[77]  Because this product is harmful to women of all ages, and to men through the destructive treatment of women it may encourage, measures that may just shield children from this product will not suffice.  This is not a situation where the government has tried to "reduce the adult population . . . to . . . only what is fit for children."[78]  This speech is damaging to adults as well.

Additionally, the label in *Bad Frog Brewery* was challenged primarily on the basis of the artwork—the depiction of the frog making an obscene gesture.[79]  In that case, one had to actually examine the label to catch its offensive nature.  Here, however, the very name of the product inflicts harm.  Any advertising pieces or restaurant menus that merely mention the name carry as much destructive force as the label itself.

---

[73] See *Fox*, 492 U.S. at 480.
[74] *Fox*, 492 U.S. at 480.
[75] *Fox,* 492 U.S. at 480.
[76] *Fox,* 492 U.S. at 480.
[77] See *Bad Frog Brewery*, 134 F.3d at 101.
[78] *Butler v. Michigan*, 352 U.S. 380, 383 (1957).
[79] See *Bad Frog Brewery*, 134 F.3d at 90.

Consequently, this case presents a scenario meriting consideration of the "captive audience" doctrine rejected in *Bad Frog Brewery*.[80]  Although not directly affiliated with a commercial speech analysis, the "captive audience" doctrine is relevant to determining that the regulation at issue is narrowly tailored.  In *F.C.C. v. Pacifica Foundation*,[81] the Supreme Court upheld a Federal Communications Commission restriction on offensive language being used on the radio in the middle of the day, recognizing the pervasive nature of broadcasting and the unintended exposure to harmful language that can occur just by turning on the radio.[82]  This doctrine was also considered by the court in *Sable Communications of California, Inc. v. Federal Communications Commission*.[83]  The Court distinguished the facts in that case, where a phone call had to be placed to encounter the offensive speech, from "public displays . . . and other means of expression which the recipient has no meaningful opportunity to avoid."[84]  An every-day grocery shopper or restaurant customer will have no meaningful opportunity to avoid Raging Bitch.  Consequently, little short of a total ban could suffice.

In light of the foregoing, Flying Dog cannot demonstrate a strong likelihood that the Commission's regulation of its commercial speech is unconstitutional.

### b.    The prior restraint doctrine's applicability is questionable, at best.

Flying Dog also claims that, as written, Mich. Admin. Code r. 436.1611(1)(d) is an unconstitutional prior restraint on speech.  But what Flying Dog fails to acknowledge is that the United States Supreme Court has not even held that the prior restraint doctrine applies to commercial speech.  "We have observed that commercial speech is such a sturdy brand of

---

[80] See *Bad Frog Brewery*, 134 F.3d at 99, n. 6.
[81] *F.C.C. v. Pacifica Foundation,* 438 U.S. 726; 98 S. Ct. 3026; 57 L. Ed. 2d 1073 (1978).
[82] *F.C.C.*, 438 U.S. at 749-750.
[83] *Sable Communications of California, Inc. v. Federal Communications Commission*, 492 U.S. 115, 127; 109 S. Ct. 2829; 106 L. Ed. 2d 93 (1989).
[84] *Sable Communications*, 492 U.S. at 127-128.

expression that traditional prior restraint doctrine may not apply to it."[85]  The Sixth Circuit broached this issue in an unpublished case, *Wilson v. Lexington-Fayette Urban County Government*.[86]  Although not squarely deciding the case on this basis, the Court recounted the weight of the prior restraint doctrine but stated, "However, the Supreme Court has ruled that "[t]he Constitution . . . accords a lesser protection to commercial speech . . . .'"[87]  In so doing, the Court intimated that the strictures of the prior restraint doctrine do not apply to speech meriting less than full First Amendment protection.  Granting a preliminary injunction on this basis would be inappropriate here, where Flying Dog cannot even demonstrate that the law of prior restraints applies to its speech.

**B.     Flying Dog's void-for-vagueness claim**

Flying Dog cannot show a strong likelihood of success on the merits of this claim.  To prevail on a void-for-vagueness claim, Flying Dog must show that the beer labeling rule's "'prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion.'"[88]  In addition to ensuring that laws provide "fair warning" of what conduct they prohibit, this doctrine also protects citizens against arbitrary decision-making by government officials.[89]   Sustaining this claim requires Flying Dog

---

[85] See *Central Hudson Gas,* 47 U.S. at 571 n. 13.  See also *Harrell v. The Florida Bar*, 608 F.3d 1241, 1269 (11th Cir. 2010) (recognizing *Central Hudson's* limitations concerning the prior restraint doctrine);  *Hunt v. City of Los Angeles*, 2011 U.S. App. LEXIS 5721, n. 7 (noting that the question remains open).  There may be some dispute among the federal appellate courts on this issue.  See *Nutritional Health Alliance v. Shalala*, 144 F.3d 220, 227 (2nd Cir. 1998) (stating that "the prior restraint doctrine does play a role in evaluating the regulation of commercial speech").

[86] *Wilson v. Lexington-Fayette Urban County Government*, 201 Fed. Appx. 316; 2006 U.S. App LEXIS 25617 (6th Cir. 2006).

[87] *Id.* at 322-323.

[88] *Miller v. City of Cincinnati*, 622 F.3d 524, 539 (6th Cir. 2010).

[89] *Miller*, 622 F.3d at 539.

to show that the rule is "impermissibly vague in all of its applications,"[90] but it cannot cross this threshold.  The terms used in the beer labeling rule, including "promot[ing] violence, racism, sexism, intemperance, or intoxication" and "detrimental to the health, safety, or welfare of the general public," are not nearly as open-ended and subjective as terms deemed impermissibly vague in other cases.  Such impermissible terms include "controversial,"[91] in "good taste"[92] and "aesthetically pleasing."[93]  Moreover, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity."[94]

## II.     Flying Dog has not demonstrated irreparable harm.

Flying Dog rests its claim of irreparable harm solely on the alleged violation of its constitutional rights.  Because it has not demonstrated that it has a strong likelihood of prevailing on its constitutional claims, it has not demonstrated irreparable harm.  Additionally, Flying Dog's delay in raising this matter emphasizes the absence of irreparable harm.  Flying Dog sat on its rights after receiving the Commission's initial decision and forfeited its opportunity to pursue an appeal in State Circuit Court.  Further, not once in the administrative proceedings did Flying Dog or its attorney assert a violation of its constitutional rights.

## III.    The balancing of harms favors Defendants.

Typically, a preliminary injunction serves the purpose of preserving the status quo.[95]  A preliminary injunction in this matter would serve precisely the opposite purpose.  Here, the very harm that Defendants seek to prevent will be caused by granting a preliminary injunction.  This

---

[90] *Village of Hoffman Estates v. Flipside Hoffman Estates, Inc.*, 455 U.S. 489, 497; 102 S. Ct. 186; 71 L. Ed. 2d 362 (1982).
[91] *United Food & Commercial Workers Union v. Southwest Ohio Regional Transit Authority*, 163 F.3d 341, 359 (6th Cir. 1998).
[92] *United Food & Commercial Workers*, 163 F.3d at 359, citing *Aubrey v. City of Cincinnati*, 815 F. Supp. 1100, 1104 (S.D. Ohio 1993).
[93] *United Food & Commercial Workers*, 163 F.3d at 360.
[94] *Ward v. Rock Against Racism*, 491 U.S. 781, 794; 109 S. Ct. 2746; 15 L. Ed. 2d 661 (1989).
[95] *Smith Wholesale Co., Inc. v. R.J.R. Tobacco*, 477 F.3d 854, 873 n. 13 (6th Cir. 2007).

type of harm cannot be undone if the Court later sustains the Commission's decision.  Not only will the government be harmed, other participants in Michigan's three-tiered system of alcohol distribution will be harmed as well.  If a preliminary injunction is issued, Flying Dog will not be selling Raging Bitch directly to consumers; rather, it will be selling to wholesalers who, in turn, sell to retailers.  Retailers ultimately sell the product to the consumers.[96]  If the Court permits the sale of Raging Bitch now and later sustains the Commission's decision, numerous parties may end up with product they cannot sell.[97]  Maintaining the status quo in this case will prevent harm to those parties.

**IV.    The public interest does not favor issuing a preliminary injunction.**

Particularly in light of the harms that would be caused by granting a preliminary injunction here, the public interest would not be served by granting Flying Dog such extraordinary relief.  The members of the public are, at worst, presently being deprived of one brand of beer.  If the injunction issues, they will be subjected to disparaging speech that they will have no meaningful opportunity to avoid.

---

[96] See Samona Aff. paragraph 9 (Exhibit 7); see also Mich. Comp. Laws § 436.1403(1).
[97] See Samona Aff. paragraph 17 (Exhibit 7).

## CONCLUSION AND RELIEF SOUGHT

For the foregoing reasons, Flying Dog has not sustained its substantial burden of showing that the circumstances here clearly demand a preliminary injunction. Accordingly, Defendants respectfully request that the Court deny Flying Dog's motion.

Respectfully submitted,

Bill Schuette
Attorney General

s/ Donald McGehee_____
Donald McGehee (P37489)
Assistant Attorney General
Attorneys for Defendants
Alcohol & Gambling Enforcement Division
525 W. Ottawa, Fifth Floor
Lansing, MI 48909
(517) 241-0210
McGeheed1@michigan.gov

Dated: May 5, 2011

## CERTIFICATE OF SERVICE

I certify that on May 5, 2011, I electronically filed the foregoing paper with the Clerk of the Court using the ECF system which will send notification of such filing to the below attorney/parties of record and I also hereby certify that I have mailed by United States Postal Service the paper to the below attorney/parties on record along with any non-ECF participants. A courtesy copy of the aforementioned document was placed in the mail directed to Judge Robert J. Jonker,

Alan Gura  - alan@gurapossessky.com
Gura & Possessky, PLLC
101 N. Columbus Street, Suite 405
Alexandria, VA  22314

s/ Donald McGehee_____
Donald McGehee (P37489)
Assistant Attorney General
Attorneys for Defendants
Alcohol & Gambling Enforcement Division
mcgeheed1@michigan.gov

18